# John Doub *vs.* John Thompson Mason and wife.

Certain grantors conveyed real and personal property to trustees, in trust, to sell the same, and out of the proceeds to pay the claims of their creditors without priority or preference except as the same may exist by law. The trustees in execution of their trust sold parts of the land to the appellant and others. At the date of the deed there were judgments against the grantors, which, after its execution, were revived by *sci. fas.* and *fiats* rendered thereon against the original defendants, and the *terre-tenants*, the purchasers from the trustees, including the appellant. Upon a bill by the appellant for an injunction to restrain proceedings upon *fi. fas.* issued on these judgments, and levied on the lands so purchased by him, upon the

Doub *vs.* Mason and wife.

ground, that the judgment creditors had assented to the deed of trust ; it was HELD:

That if the judgment creditors assented to the deed of trust, and by their conduct induced the appellant and others to become purchasers of the lands bound by their judgments, and to believe that they would look to the trustees for the payment of their claims and not to their judgment liens, such conduct would furnish a valid equitable defence against the enforcement of the judgment liens by executions.

It would be a fraud on the purchasers to allow the judgment creditors, after such conduct, to enforce their judgments against such purchasers.

In such a case it would not be necessary for the purchasers to see to the application of their purchase money.

But it is incumbent on the purchasers to establish *affirmatively* that the judgment creditors, by their conduct, either in fact abandoned their liens, or by it induced the purchasers to believe they designed *to look exclusively* to the trustees for payment.

Unless it so appear the purchasers have no right to invoke the intervention of a court of equity to restrain the judgment creditors from enforcing their executions.

In this case the appellant having failed to establish by proof an equity as above required against the judgment creditors, his injunction was dissolved and bill dismissed.

The appellant was a party to the *sci. fas.*, and confessed judgments *of flat* to the full amount of the original judgments. HELD: That it is too late now, after the judgments have been assigned, to avail himself of an equity growing out of payments made on the judgments before *flat;* he should have taken advantage of this defence when the judgments were revived.

It would be a fraud to allow him now to claim a set-off against a *bona fide* assignee who was induced by his act to believe there was no objection to the *amount* of the judgments so confessed.

APPEAL from the court of Chancery.

This case originated in a bill filed in chancery by the appellant, Doub, on the 17th of January 1846, against the appellees and others, and has been several times brought into this court by the appeals of the different parties having distinct interests therein. The cases of *Doub vs. Barnes, et al., 4 Gill,* 1. *Barnes, et al., vs. Dodge, et al., 7 Gill,* 109. *Thomas vs. Doub, et al,* 8 *Gill,* 1. *Dodge vs. Doub, et al.,* 8 *Gill,* 16, and *Thomas vs. Doub,* 1 *Md. Rep.,* 252, are all branches of the same cause, originating in the same bill.

This statement will therefore be confined as strictly as possible to the rights of the parties to the present appeal.

The bill prays for an injunction, which was granted, to restrain the appellees, Mason and wife, from enforcing against certain lands of the appellant various executions issued out of Washington county court on judgments in said court, and levied on said lands. These judgments were obtained at November term 1837, at the several suits of Trimble use of the bank of Baltimore, Brown for same use, H. Tiffany, Tiffany, Ward and Co., and Brooks and Hotchkiss, and were all of them judgments against A. Barnes, M. B. Mason and J. T. Mason, being the first judgments obtained against said J. T. Mason. On the 11th of October 1839, after the rendition of these judgments, the parties against whom they were obtained united in the execution of a deed of trust to Price and Yost, of certain real estate, for the benefit of their respective creditors. This deed recites, that "Abraham Barnes is indebted in various sums of money, and is desirous to make adequate provision for the early payment of the same in full;" and that "the said M. B. Mason and J. T. Mason are severally bound, together with the said Barnes, for payment of some of said debts, and are willing, so far as respects their interest in any of the property in said deed mentioned, to subject the same in common with the property of the said Barnes, to the payment of the said debts;" and conveys a variety of real and personal estate, in trust, to sell the same and apply the proceeds "to the payment of all the debts of the said grantors, without any priority or preference, except as the same may exist by law."

Price, one of said trustees, was the attorney of record for some of these judgment creditors, and Yost, the other trustee, was the attorney for the others when this deed was executed. The trustees proceeded to sell the lands conveyed by the deed, and those of J. T, Mason, on which the executions were levied, were sold to the appellant Doub, as follows: The first parcel on the 25th of March 1840, for $12,566.44, and the last on the 1st of October 1843, for $967.50, the first of which

was paid for by Doub, at the period of its purchase.  After long delay, no part of the purchase money having been applied to the payment of the judgments against said J. T. Mason, he resolved to take measures for his own protection, and accordingly sought an interview with Doub about the close of the year 1843, the result of which will be given below.  Failing in this effort he applied to the judgment creditors, who accordingly took the conduct of the judgments out of the hands of Price and Yost, and caused *sci. fas.* to be issued on all of them against the terre-tenants, including Doub, returnable to March term 1845, of Washington county court, at which term Price and Yost appeared to said *sci. fas.* as attorneys for the said terre-tenants, and amongst others for the said Doub; and at the same term, under a written agreement to that effect, there was a *fiat by confession* in said judgments against all the parties, including Doub, with an agreement for a stay of execution for eight months.  After said judgments had been thus revived, J. T. Mason, who had become trustee of his wife for certain property owned by her at the time of her marriage, and then settled to her separate use, became, as such trustee, the fair and *bona fide* purchaser for full value of said judgments, by the exchange of her said property at its appraised value for them with said creditors, and the said judgments were accordingly entered for the use of the said J. T. Mason, as trustee of his said wife.  After the eight months stay upon the judgments by confession had expired, executions were issued and levied upon the lands of the appellant Doub, who thereupon filed the bill in which this cause originated, and on which the injunction in question issued.

The alleged equity of this bill, so far as it relates to the defendants, Mason and wife, is, that the original judgment creditors had notice of the deed of trust shortly after the making thereof, and acquiesced in the assumption by the trustees of control over said property; that they suspended all proceedings on their judgments, and by other acts indicative of their intention to look for payment of their claims to the proceeds of sales, which should be made by the trustees, gave

credit to the trustees and enabled them to make sales more eligible to the creditors than could otherwise have been effected; and that complainant was persuaded to purchase as aforesaid, and to make payments of the purchase money to the trustees, from his belief that the creditors would look to the trustees only for payment of their claims out of the proceeds of sales to be made by them. And as evidence of the acquiescence and assent of said creditors, the bill charges, that at and for some time after the date of said deed of trust, the said Price and Yost, the trustees, were attorneys of record of said judgment creditors. This bill did not make the original judgment creditors parties.

Mrs. Mason, in her answer, states, that she knows nothing of the matters complained of in the bill, and then sets out her title, which it is unnecessary to state as it was admitted to be unquestionable. J. T. Mason's answer says, that he executed the deed under the belief that the property conveyed by him would pay all the debts that he owed as principal or surety; but that he was soon informed that it would only pay the judgments against him at the date of the deed, and that he thereupon immediately applied the results of his professional labor to the payment of all subsequent debts, in the full confidence that those prior to the deed had been amply provided for. He then refers to the order of priority of the judgments to show that the trustees had neglected their duty or mistaken it, and states, that he communicated to the complainant the fact of the misapplication of the proceeds of sale by the trustees, and warned him of the consequences as a purchaser of his, Mason's, land, and sets forth the following details of his interview with Doub, and the results thereof, which, by agreement, was admitted to be, in substance, as follows: "That Mason, in January 1844, being before the *fiats* were obtained on the *sci. fas.*, went to complainant's house and told him of the fact of the misapplication of his purchase money, that although his farm had been paid for, yet that it was liable again to be sold to pay the judgments against this defendant, and that he, Mason, would

insist upon holding complainant's farm for said judgments. Knowing complainant's ignorance in matters of law, defendant urged him to state his case to some attorney who had no interest in the matter, and to seek for advice. Defendant considering Yost, one of the trustees, as the standing counsel for the complainant in all matters, suggested the propriety of his employing some other attorney in this particular case, and which complainant said he would do, and agreed that this defendant should state his case to *George Schley, Esq.*, an attorney at law, and that he, complainant, at another time would come into Hagerstown and ascertain his opinion and advice. Defendant did accordingly state the case to the said Schley. At the time to which defendant now refers the trustees had remaining unsold a large amount of the lands of Barnes which defendant thinks was double in quantity and value to the land sold to complainant, and believing at the time that the misapplication of complainant's purchase money had consisted in payment by the trustees of judgments against Barnes, in which defendant was not a party, defendant strongly urged complainant to surrender back the lands he had purchased to the trustees, and take in return a portion of the land of Barnes, equal in value to it, which defendant thought would obviate the difficulties of which he complained, and relieve the complainant from the liability he was under to pay the aforesaid judgments. This plan for the relief of complainant was submitted to said Schley. That on the day fixed by complainant for consulting with said Schley, he came into town, but first went to Yost, one of the trustees, who allayed his fears, by telling him there was no ground for alarm, that he, Yost, would protect complainant's interest. That complainant made the above representation to this defendant, and thereupon declined to consult said Schley as he had agreed to do." The answer further states, that defendant then urged the judgment creditors to press for payment, who accordingly dismissed Price and Yost, and obtained judgments of *fiat* as before stated. That defendant purchased these judgments after *fiat*, with money belonging to his wife's trust estate, giving full

49    v.2

value therefor.    That the trustees never called upon creditors for their assent to the deed, and that the judgment creditors from whom he bought had assured him that they had never waived their legal rights, which assurances defendant believed.

Upon these answers, a motion was made for the dissolution of the injunction upon bill and answer, and the chancellor thereupon dissolved the injunction as to Mr. and Mrs. Mason, and the complainant appealed, and the Court of Appeals reversed this portion of the decree and remanded the cause for further proceedings.    See report of this case in 4 *Gill*, 1 *to* 22.    The cause being thus remanded, proof was taken by the complainant to make out his alleged equity against Mr. and Mrs. Mason.    This proof consists:—1st. Of four receipts, all dated 8th of July 1840, given by Yost, as attorney for H. Tiffany, Tiffany, Ward & Co., Brooks and Hotchkiss, and J. W. Brown, to Price and Yost, as trustees, for payments on account of their respective judgments.    These payments amount in the aggregate to $1100.    2nd.    To show that the original judgment creditors, Trimble and Brown, and their *cestui que use*, the Bank of Baltimore, assented to the deed of trust, the complainant offered a correspondence between said Yost and J. M. Gordon, the attorney in fact of the Bank of Baltimore, as the owner of said judgments, relative thereto, beginning on the 27th of November 1840, and ending in May 1844. The first letter of this correspondence is from Yost to Gordon, dated 27th of November 1840, and informs the latter, that "the trustees of Mr. Barnes have sold upwards of two thousand acres of land, about twelve hundred acres remain unsold. We have offered this balance at private sale, and will close it as soon as we can get something like a fair price for it.    It is impossible to say at what time these judgments will be paid.    I consider them perfectly safe, and we, of course, will do every thing in our power to settle up the estate as early as practicable."    The second is also from Yost, dated 1st December 1840, and acknowledges the receipt of one from Gordon, enclosing an order from Mr. Trimble to him, and Messrs. Price and Tidball, (his attorneys,) to enter his judg-

ments for the use of the Bank of Baltimore, which he, Yost, promises to do. The third also from Yost, dated 21st of January 1842, in answer to a letter from Gordon, of the 19th of the same month, asking information concerning the judgments of Trimble vs. Barnes, says: "I think the amount of judgments standing before the last of Trimble's judgments referred to, is about $130,000. We have sold lands to the amount of upwards of $100,000, the purchase money for which, we think, we shall be able to realise. The residue of the lands unsold is about twelve hundred acres, which, we think, ought to bring at least $40,000, if we can ever sell them; we have been doing every thing in our power to close the sales, but have not yet been able to do so. We are still trying to sell, but such is the condition of monetary affairs, that it seems impossible to effect sales, and no man can calculate on what may be the ruinous depreciation of property. I am of opinion that these judgments will be ultimately safe, but when or how soon we shall be able to bring the business to a close, will depend on our future sales and our success in collecting the purchase money. Of this you will be able to form a pretty accurate opinion. All that I can now say is, that we are as anxious as any of the creditors to close our trust, and nothing on our part shall be wanting to effect it as early as practicable." The fourth is from Gordon to Yost, dated 23rd of November 1842, calling the attention of the latter to the judgments of Trimble vs. Barnes, entered for the use of the bank, and making an inquiry in relation to the third judgment, being for $700. This letter states, that in November 1840, Trimble assigned three judgments to the use of the bank; that with the order of assignment, Trimble "gave me a statement of the two first judgments, omitting the third, for $700, which I understood him to say was satisfied or rendered in mistake." The letter then quotes from two preceding letters of Yost, in reference to a credit upon one of the judgments, which Gordon insists was credited upon the wrong one, and then says: "Will you do me the favor to look to the judgments embraced in the orders of Trimble, November

1840, and see whether they have been assigned to the use of the bank, and advise me whether the $700 credit has been entered on the $1400 judgment. Be pleased to say what prospect of satisfaction of the above judgments." The fifth is a letter from Yost, in reply to the preceding, dated January 19th, 1843, and gives a statement of the judgments assigned to the bank and the several credits thereon, and says: "We have been effecting some sales of land within the last four or five months, at pretty fair prices for the times, but we still have some six or eight hundred acres unsold, after every exertion we could make in offering it at public and private sale. The times are sadly out of joint, and we find it a most onerous business. All I can say is that every thing in our power shall be done to close the trust as soon as practicable. I feel satisfied no creditor on the list can feel a greater desire than we to get through with this business." The sixth is from Gordon to Yost, dated March 8th, 1844, containing a short copy of Brown's judgment for the use of the bank, and says: "I beg leave to call your attention to the above judgment, and to inquire whether it were not well to revive it. Should you think so, will you have the goodness to give the necessary order? Your last favor, January 19th, 1843, was duly received and contents noted. You observe in it that the $1400 judgment (obtained by Mr. P., August 14th, 1838,) is subject to the credit of Brown's judgment of $700. Such being the case, it will be proper to keep alive the Brown judgment likewise, as the credit on the two judgments was but $700. Can you give me any opinion, from your knowledge of Barnes' affairs, whether the estate will pay this judgment or any part of it? and when? and so in regard to the other two judgments. In your previous letters you have stated that you considered them safe. Particular information on these points will much oblige the bank and myself. I have written to Messrs. Tidball and Price on the subject of the several judgments obtained by them, for $1867.01, and $1400. Should they be absent and not in Hagerstown before 1st day of the term, will you do me the favor to attend to orders for *scire facias*?" The

seventh letter, dated 11th of March 1844, is from Yost, in reply to the preceding, and says: "The trustees have proceeded far enough to enable me to speak with certainty upon this subject." He then says that the first judgment of $1867.01, and the Brown judgment of $700, "will certainly be reached and ultimately paid, but the last Trimble judgment against Barnes alone will, I am certain, not be reached. You are aware of the principle which applies in marshalling the assets. The whole proceeds of Barnes' lands will first be applied to the payment of his debts as far as they reach, and then the proceeds of the sales of John's and Melchoir's lands will be applied to the payment of the judgments against Barnes, in which John and Melchoir are securities." He then states that the bank's loss will be but half of the $1400 judgment, and proceeds: "You ask whether it would not be well to revive these judgments by *sci. fas.?* In reply to this inquiry I would say, it would not place them in any better situation than they now stand. They could only be revived subject to the prior judgments, and would then occupy the same relative position in payment which they now hold. I can see no advantage to be gained by such a course. On the contrary, it will produce difficulty and embarrassment in closing the account. If *sci. fas.* should be issued, they would have to be served on all the *terre-tenants* who are purchasers of the land. Such a proceeding would alarm purchasers and prevent them from paying up their purchase money to the trustees. We have sold land enough to cover the two judgments above mentioned, and if we could get the purchase money, we could soon pay them off. But we shall be obliged to bring suit for a large portion of the purchase money, which will delay the closing of the trust longer than we wish. You have no idea of the difficulties the trustees have encountered in their proceedings from the rumors about the defect of title, and forty other stories, which have drawn off persons who were disposed to purchase, and prevented others from paying for land which they had bought of us, and if now the writs of *scire facias* should be issued, as suggested, it will create new

alarms and difficulties, and produce further embarrassment and delay, and I can see no advantage to be gained by such a proceeding. The judgments will not be barred by limitations for four or five years to come. The $1867 judgment and the $700 judgment you may consider ultimately safe, and would ask of you not to proceed in any of these cases by *scire facias*. I believe the money will be realised sooner, if we are permitted to proceed in closing the trust without producing any new alarm. I have now given you my views candidly on this subject, and hope, under these circumstances, you will not proceed as proposed." The eighth letter is from Gordon, dated 16th of March 1844, in reply to the preceding, stating that he had been awaiting the replies of Messrs. Price and Tidball, the other attorneys in the case of the Trimble judgments, and informs Yost that he shall be very much guided by the advice of Mr. Tidball in the steps to be taken as to the judgments. The ninth letter is also from Gordon, dated 3rd of May 1844, and says: "I am requested by the president of the Bank of Baltimore, the assignee of the judgment of Brown vs. Barnes and Mason, for $700, again to invite your attention to it, and to inquire whether it is not entitled to payment from its order of priority out of the funds already received for the sale of the trust estate? If such be the fact, the bank, I am directed to say, will expect an early settlement. Information on this point is desired by the bank before deciding upon the question of a *scire facias*." The tenth and last letter is from Yost, dated 11th May 1844, in reply to the preceding, in which he says: "You inquire whether this judgment ought not to have been paid out of funds received from its order of priority? In reply to this inquiry, I have to inform you that it would not be so paid. The trustees have sold property sufficient to cover this claim, and if the purchase money had been paid, we could before this have paid it off. But we have been obliged to bring suit for this purchase money, which has produced a delay which we could not avoid. We have, however, paid to Mr. Trimble on this claim, as far back as July 13th, 1840, $127. Mr.

Trimble wanted money, and we made this advance to him out of the priority, supposing at that time that we could have closed the business long before this. If you would prefer having a *scire facias* issued in this case, and will so direct, I will have it done immediately."

The complainant then examined the said Gordon, who testified and said, that he was the attorney of the Bank of Baltimore for the collection of the claims mentioned in the above letters. That he wrote the said letters, not under any special direction at the time, but in the course of his duty in the collection of the debts. Whether he advised with the bank at each of the times of writing said letters he does not recollect, but he considered himself authorised to write said letters under his general authority to collect the debt. On cross-examination witness stated, that he never was requested, as attorney for the bank, and on behalf of the bank, to agree to the provisions of the deed of trust, and had he been so requested he should have refused. That he never saw said deed, and knew nothing of its provisions except from hearsay. That he did not feel himself authorised to agree to the provisions of said deed on behalf of the bank, without the special authority of the bank, which was never asked, and which the bank never gave him. That he always looked to the payment of the judgments in the order of their priority and as liens on the property. That the above letters from Yost were addressed to him as the attorney of the Bank of Baltimore, representing said bank's claims against the estate of Abraham Barnes, and were received by him in due course of mail.

To show that the other judgment creditors, Henry Tiffany, Tiffany, Ward & Co., and Brooks and Hotchkiss, all assented to the deed of trust, the complainant offered and relied upon a correspondence between Yost and the said parties. This correspondence, prior to the 11th of October 1839, the date of the deed, shows, that Yost was the attorney for these creditors, and recovered the judgments for them. In a letter, dated 3rd of October 1839, to Henry Tiffany, Yost informs him that Barnes had failed in his efforts to procure a loan,

and that his land is so shingled over with judgments, that no purchaser would touch it at sheriff's sale, and that there is no course left, either for him or the creditors, but to execute a deed of trust. The land can only be sold by a trustee, so as to secure all his creditors. In another letter, dated 30th of May 1840, Yost, in reply to one which he had received from Tiffany, gives a statement of the judgments against Barnes; states that the trustees had managed to get Mrs. Barnes to relinquish her dower, by which they had saved thousands of dollars for the creditors, and especially for the junior judgment creditors; that the trustees had borrowed money on their own responsibility, to pay off some of the junior judgment creditors who were pressing their claims, the elder creditors being willing to wait, but that they would so borrow no more. He also expresses in this letter the opinion that the claims on judgments are all safe, and states that the trustees were doing all they could in expediting the trust. In another, dated 17th of November 1842, in reply to one from Tiffany, of the 16th of the same month, Yost says: "In regard to the Barnes' claim, we would be willing to sell you, or any of the creditors whose claims are certainly covered by judgment, land in our hands, as trustees." Tiffany, in a letter to Yost, of the 16th of April 1843, says, he is desirous to close the case of Barnes, and proposes to sell his judgments to some one near Hagerstown. "I should like to settle my claim by taking land at a fair price, if you can give me a good title." In another letter, dated 10th of February 1844, Yost informs Tiffany that the trustees were still selling the lands, and that his claim was safe, and would be discharged as early as possible. William Tiffany, in a letter to Yost, of the 9th of June 1843, says: Will you be kind enough to inform me of the result of your effort to sell on the 3rd inst., I allude of course to Barnes' property? If you have succeeded in effecting a sale, will you hand us over the paper? If you have not succeeded, the sheriff must be directed to proceed upon our judgment forthwith, and either get the debt or lose it." In a letter to Brooks, dated 3rd of January 1840, Yost says: "With regard

to your claim against Barnes, I would refer you to Mr. Henry Tiffany, to whom I wrote last week, and gave him a full statement of the whole matter."

The defendants, Mason and wife, on their part offered the proof of the creditors who had assigned to them, viz: Brooks and the two Tiffanys, showing that each and all aver that they had never seen the deed of trust, that they had never accepted, or been asked to accept the deed and surrender their liens, and had never authorised their attorneys to accept it for them, and that they would not have agreed to surrender their liens. (This evidence of the assigning creditors, the complainant excepted to as the testimony of incompetent witnesses.) The defendant Mason's statement, in his answer as to notice to Doub, and his interview with Doub, and its results, as above given, which was admitted to be proved. The defendants excepted to Yost's letters to Gordon and to the receipts of Yost, which were, however, admitted to be in the handwriting of Yost.

The case being again submitted to the chancellor, the injunction against Mrs. Mason was again dissolved, and his opinion and decree thereon are reported in 1 *Md. Ch. Decisions*, 128. The complainant, Doub, again appealed, and the Court of Appeals again remanded the cause to the court of chancery, but without expressing particularly the reasons for remanding, or declaring their opinion on the points presented. After this second remanding, some further proceedings were had in chancery relative to the regularity of the taking of the proof above referred to, which was finally admitted by agreement as if regularly taken. The defendants excepted to all proof of payments on the judgments before the *fiat by confession*. The last decree of the chancellor was passed at March term 1851, and again dissolved the injunction as to Mason and wife. The appeal of Thomas, another defendant, from this decree was heard and determined at the last term of this court, and is reported in 1 *Md. Rep.*, 252. The present appeal was taken by Doub, the complainant, from that part of the decree which dissolved the injunction as to Mason and wife.

---

Doub *vs.* Mason and wife.

---

The cause was argued before LE GRAND, C. J., ECCLE-STON and TUCK, J.

*Thomas S. Alexander* for the appellant.

1st. On the judgments revived and entered for the use of Mrs. Mason, he claims credits for payments made by the trustees to the attorney for the plaintiffs on the 8th July 1840, viz: for $200, paid to the Bank of Baltimore; $500 paid to Henry Tiffany; $200 paid to Tiffany, Ward & Co.; $200 paid to Brooks & Hotchkiss. It is insisted that his right to these credits is not to be prejudiced by the entry of *fiats* on the judgments subsequent to the payments.

He was ignorant of the fact of such payments until long after the judgments had been revived, and under the circumstances his ignorance ought not to be imputed to him as the result of culpable neglect.

And again, upon the hypothesis that he had notice of the fact of payment in time to have availed himself of the defence at law, it is insisted that the rule that relief shall not be given in equity against a judgment, for any matter which would have formed a defence at law, is designed to prevent the delay and expense attendant on unnecessary litigation. The principle can have no application to a case where the party sued at law having two defences, the one cognizable indifferently at law or in equity, and the other purely of equitable cognizance, suffers judgment by default, and then comes into equity to be relieved on both grounds of defence. In such case the objects of the rule, economy and despatch, would be vindicated, not thwarted, by resting the two matters of defence on the issue of one litigation. In the present case, the appellant had a fair defence in equity to the entire demand: and as in the progress of this necessary suit in equity, the fact of partial payment, could be more conveniently determined, he would have been justifiable in declining to try that fact on a plea of payment to the *scire facias* at law. In order to explain and illustrate the reason of the rule, that it presupposes default on the part of the defendant at law, and that it yields to the special justice of the case, see 1 *Story Eq.*, sec. 33. 2 *Story Eq.*, sec. 894, 895, 896.

2 *P. Wms.*, 424, *Gainesborough vs. Gifford.* 3 *Atk.*, 223, *Williams vs. Lee.* 2 *Swanst.*, 232, *Protheroe vs. Forman.* 1 *Sch. & Lefr.*, 201, *Bateman vs. Willoe.* 7 *Cra.*, 332, *Marine Ins. Co. vs. Hodgson.* 1 *Johns. Ch. Rep.*, 91, *Simpson vs. Hart.* 5 *Paige*, 249, *Norton vs. Woods.* 6 *G. & J.*, 312, *Gott vs. Wilson.* 12 *G. & J.*, 365, *Gardiner vs. Hardy.* 10 *Johns.*, 587, *Rathbone vs. Warren.*

2nd. The creditors, (whose judgments are now assigned to Mr. Mason,) before the execution of the deed of trust from Messrs. Barnes and the Masons to Messrs. Price and Yost, had notice that the making of such deed was in contemplation; their attorney, Yost, deemed it necessary for the interests of the creditors, that the property should be sold by trustees under the provisions of a deed of trust rather than by the sheriff under executions: shortly after the deed was made they had notice of its execution; they had notice that the trustees had assumed upon themselves the execution of the trusts created by the deed, and were engaged in selling the estates and collecting and applying the proceeds; they did not at any time express their dissatisfaction with the deed, on the contrary, they required the trustees from time to time to account for the progress they had made in the execution of their trusts, and actually received from the trustees partial payments on their claims; and, in short, the plain and necessary conclusion from the evidence is, that they assented to the execution of the deed.

If the conclusion from the evidence is that the creditors actually assented to the deed of trust, it is presumed authorities will not be required to show, that they ought not to be permitted at this time, to disturb the purchasers claiming under the trustees. But it is insisted, that it is not essential to the case of the appellant, that he should show express assent on the part of the creditors. On a former hearing of this cause, this court declared that if "the judgment creditors assented to the deed of trust, and by their conduct induced the complainant and others, to become the purchasers of lands bound by their judgments, and to believe that they would look to the trustees for the payment of their claims, and not to the liens created by their judgments," "such conduct would furnish a valid equi-

table defence.  To allow the judgment creditors, after such a course of conduct, to enforce their judgments against the purchasers, would be to permit them to perpetrate a fraud upon the purchasers.  The obvious consequence of such a procedure on the part of the judgment creditors, would be to lull the purchasers into a false security, and to induce them to believe that a title would follow the payment of the purchase money."  Hence we conclude that it will be sufficient to entitle the appellant to relief, to prove that the creditors pursued a line of conduct which was reasonably calculated to, "lull the purchasers into a false security ;"—that they were silent when good faith required them to speak ; that they acquiesced in the assumption by the trustees of authority over the lands bound by their executions, and contented themselves with asking for accounts of the progress made by the trustees in execution of their trusts at times when they must have known that the relation of attorney and client subsisting between one of the trustees and themselves, and the contents of their correspondence, were well calculated to give credit to the trustees with the public, and to lull purchasers from them "into false security," and "induce them to believe that a title would follow the payment of the purchase money."

Nor will it be necessary to shew that all those acts of the judgment creditors now relied on, were known to the purchaser or had transpired at the date of his purchase.  Subsequent acts or declarations are evidence of original agreement or consent.  A subsequent confirmation will operate by relation as an antecedent authority.  And the purchaser, who purchases in reliance on the assurances made by the trustees, of their power to convey a valid title, will be entitled to the benefit of every fact which tends to establish their power.  If, for example, the appellant could now produce an instrument under seals of the judgment creditors, ratifying and adopting the deed of trust, and executed cotemporaneously with the deed, the value of such instrument as a protection in equity, would not be impaired by his inability to show that he had notice of its existence at the date of his purchase.  And special reliance is placed on the facts, that of ninety-four judgments against the grantors,

open at the date of the deed of trust, no less than fifty were in the hands of one or other of the trustees as plaintiff's attorney, and that all the judgment creditors, other than those represented by Mrs. Mason and Lynch and Craft, assented to the deed.

In support of these positions, the cases following are relied on:

1 *Story Eq.*, sec. 384, 385. 1 *Fonbl. Eq.*, *book* 1, *ch.* 3, *sec.* 4. 1 *Eq. Ca. Abr.*, 356, *pl.* 10, *Hanning vs. Ferrars. Gilbert Eq. Rep.*, 85, *S. C.* 2 *Vern.*, 150, *Hunsden vs. Cheney.* 2 *Atk.*, 83, *East India Co. vs. Vincent.* 5 *Ves.*, 688, *Jackson vs. Cator.* 7 *Ves.*, 235, *Dann vs. Spurrier.* 7 *Simons*, 1, *Govett vs. Richmond.* 6 *Ad. & El.*, 474, *Pickard vs. Sears.* 3 *My. & Keen*, 632, *Parrott vs. Palmer.* 3 *My. & Cra.*, 769, *Greenhalgh vs. Manchester and Birmingham Rail Road Company.* 4 *My. & Cra.*, 186, *Nicholson vs. Hooper.* 4 *Wash C. C. Rep.*, 608, *Haight vs. Proprietors.* 1 *Story Rep.*, 282 *Wyeth, vs. Stone.* 1 *Johns. Ch. Rep.*, 344, *Wendell vs. Van Renssellaer.* 5 *Johns. Ch. Rep.*, 188, *Higinbotham vs. Burnet.* 2 *Johns. Cases*, 424, *Armstrong vs. Gilchrist.* 4 *Munf.* 351, *Taylor vs. Cole.*

3rd. It is insisted, that the decision recently made by this court in this cause on the appeal of John Hanson Thomas, clearly establishes the existence of a fund within the reach of the court, adequate to the satisfaction of the judgments now represented by John T. Mason, on behalf of his wife. And it is competent for the court, notwithstanding the decree passed on said appeal, by which the cause as between the said John Hanson Thomas and the complainant, is remanded to the court of chancery, to give relief to the said Mason, as against said fund. On the former appeal, the only party appearing as appellee was the present appellant; and it was assumed in argument by the counsel for the then appellant Thomas, that the questions arising on the record as between the said Thomas and the said Mason, would remain for discussion on this appeal.

But if this was otherwise, and by reason of the failure of the said Mason to appear on the hearing of the former appeal,

he has lost his right to claim satisfaction out of said fund in the present state of the cause, the appellant is, on the principles of this court, entitled to a stay of execution on the judgments of the said Mason, until the equity of the said Mason as against said fund, shall have been finally determined.

To show that equity will grant relief as between co-defendants, we rely on 3 *G. & J.*, 311, *Diffenderffer vs. Winder.* 2 *Sch. and Lefr.*, 709, 718, *Chamley vs. Dunsany.* 2 *B. & B.*, 271, *Conry vs. Cawlfield.*

*Mc Lean* and *Mc Mahon* for appellees.

FIRST POINT.—*As to the nature and availability of the alleged equity, set up by the appellant.* By reference to the pleadings and proof in the case, it will be seen that there is no claim to relief on the ground of any equity, as against the judgments themselves, or the claims on which they are founded, or of any equity of the debtors against whom the judgments were rendered; but on the contrary, the justice of the claims on which the judgments are rendered, and the right to the payment of the judgments, are uncontroverted. The only alleged or pretended equity is, that whilst the Bank of Baltimore and others, (the parties by whom the said judgments were assigned to the appellee, as the trustee of his wife,) were the holders of said judgments, they, the said *assignors*, so acted with reference to the appellant, taking title to a part of the lands bound by said judgments by conveyance, from the trustees, under the trust deed, so as to give him, the appellant, an equity, *founded on the acts and conduct of said assignors*, which entitles him to relief, as against the said *assignees*, Mason and wife. It is not denied that said judgments were assigned to the appellee, Mason, for fair and full value, and that he took said assignment, and had the said judgments entered for his use, after being revived by *sci. fas.*, without notice of the alleged equity, founded on the acts of said assignors. It is not pretended that there is any equity founded on the acts or conduct of Mason or wife, the assignees; and the sole claim to relief, is on the ground that the said alleged equity of the appellant, as against said assignors, descended upon and bound the said Mason and wife, as

said assignees, and entitles him to restrain them by injunction, from the execution of their *legal process* on said judgments. It is also shown, that after said equity arose, if it ever existed, the said Mason had the interview and held the conversation with the appellant which is set forth in the above statement, in which there was no pretence or intimation of any such equity; that subsequently the appellant, by his attorneys of record, confessed judgments on the *sci. fas.*, in March 1845, with a stay of execution thereon by agreement, and without the intimation of any such equity; and that after all this had occurred, the appellee, Mason, became the purchaser for value of said judgments, and without notice of any such alleged equity, and had the same entered for his use as said trustee, and issued executions thereon: to restrain the execution of which is the object of the bill in this case.

And the appellees denying that this alleged equity, even if proved, is sufficient to entitle the appellant, under the above state of facts, to restrain the appellee, Mason, in the exercise of his acknowledged *legal* right, to enforce these judgments against the lands bound by them, maintain the following positions:—1st. That Mason, as said purchaser and assignee for value of said judgments, and without notice of said alleged equity, did not take them subject to such equity, which is not an equity of the original debtors, or one affecting the validity or justice of the judgments assigned, but a secret equity, alleged to exist as between the assignor, as the third party holding a part of the lands bound by said judgments. 2nd. That even conceding the existence of the alleged equity, still Mason and wife, as assignees for value, and without notice of it, had at least an equal equity, and that the said assignees having this equity, and having had the said judgments entered for the use of Mrs. Mason, and having issued executions thereon, in the exercise of their acknowledged *legal* right, a court of equity will not restrain them in the exercise of that legal right where the equities are equal. 3rd. That this alleged equity is not only the mere equity of a third party against the assignors, but also a secret equity, which, if it

existed, must have been known to the appellant at the period of his interview with Mason, and when he confessed the judgments, and obtained, by agreement with Mason, a stay of execution thereon; and it was therefore a secret equity, which, if not designedly withheld, was at least not even intimated, under circumstances calling for inquiries entitling Mason to its disclosure; and by the non-disclosure of which, Mason was led into the purchase of the judgments, and it was therefore an equity, which, if now permitted to be set up against Mason and wife, would operate as a fraud upon them, attributable to the silence or laches of the appellant, and therefore not entitling them to the injunction prayed for.

SECOND POINT.—*As to the necessary constituents of the alleged equity.*—And under this point the appellees maintain, that to establish this equity, even if available against them, it is incumbent upon the appellant to show by clear proof, that the assignors, under whom the appellees claim, did not merely assent to the deed, but did also, by their acts or conduct, induce the appellant, when purchasing from and paying the trustees for the lands bought by him of them, to believe that they, the said assignors, would look for the payment of the judgments to the trustees alone, and to the proceeds of the sales in their hands, and not to the liens created by their judgments; and that the appellant being otherwise under the obligation to see that his purchase money was applied to the discharge of the liens incumbent on the lands bought by him, was thus, by the acts or conduct of said assignors, properly induced to believe that he was absolved by them from that obligation, and purchased and paid the trustees under that belief. And the appellees maintain, that this is not only the equity alleged in the complainant's bill, but also the only equity to which any sanction is given by the former opinion of this court in this cause, as well as by the decision of the chancellor. And they also maintain, that even if it were conceded to be an open question, yet from the very nature of the deed of trust itself, nothing short of these facts could give the appellant an equity against the lien of these judgments. The

deed was one made by the debtor of his own motion, and by its terms, neither asking nor requiring for its operation the consent of the creditors. It did not attempt or profess to displace or disturb, in any way, any of the liens, by judgment or otherwise, then incumbent on the lands conveyed by the debtors, but on the contrary, conveyed them to the trustees, subject to the payment of all their debts, according to their legal priorities, and therefore imposed on the purchaser from the trustee, the obligation to take notice of the liens and see to their discharge. And as, therefore, the deed conveyed subject to the liens, expressly preserved them according to their legal priorities, and carried with it this obligation on the purchaser from the trustees, to take notice of and see to the application of his purchase money in their discharge, no mere assent of the creditor to, nor acquiescence in, such a deed, thus protecting and preserving his lien, could have the effect of waiving or surrendering it.

THIRD POINT.—*As to the evidence of the existence of the alleged equity.*—Under this the appellees maintain, by the unquestioned proof in the cause, not only that there is no proof that the appellant was induced to purchase and pay the trustee for his lands, "under a belief, well founded in the conduct of the creditors, that they, the creditors, would look to the trustees alone for the payment of their debts out of the proceeds of the sales," but also that it is affirmatively and clearly shown, that this could not possibly have been the case, and that therefore these, the material allegations of the complainant's bill, are manifestly untrue. It is shown by the proof, that the appellant had in fact paid to the trustees all, except a very inconsiderable portion of his purchase money, as early as March 1840, and therefore, before even the occurrence or existence of the acts or conduct of the assignors relied upon to establish the equity; that there is not a tittle of evidence to show that the appellant had ever, at any period before the completion of his purchase and payment, any knowledge whatever of any of the said acts or conduct of the assignors, and that therefore all pretence that the appellant acted under the

51     v.2

knowledge of such acts or conduct, and was induced by them to purchase from and pay the trustees, is gone by the proof, and with it the whole equity of the bill.

And the appellant seeming to concede this, and thus necessarily abandoning all pretence of fraud upon him by the acts or conduct of the assignors inducing him to the purchase and payment, *now* places his equity upon the new and untenable ground, that, in the absence of all such knowledge or belief on the part of Doub, the mere naked and subsequent assent of the creditors to the trust deed, or their mere acquiescence in the claim and exercise of title under that deed by the trustees, is sufficient to establish his right to the injunction against the assignees, Mason and wife. In opposition to this it is maintained, as before stated, that by the former decision of this court, as well as from the nature and legal effects of the deed itself, no such mere assent or acquiescence, if conceded, could impair the lien of the judgments in the hands of the appellees, and especially not in a case where the party who purchased, when warned of his obligations and liabilities as such purchaser, and urged to take measures for his security, refused to do so, and suffered the judgments to be revived and the appellees to become purchasers of them, without the intimation of any equity against the judgments.

And as to the proof relied upon to establish even this mere naked subsequent assent or acquiescence, it is maintained from the proof, that the deed was not only one neither asking nor requiring the assent of creditors, but also that the creditors, assigning the judgments to the appellees, not only did not assent, but were not even desired to give assent to it, nor was it intimated to them that their assent to it was in any way material, nor that they were desired for any purpose or to any extent, to waive their liens, or to do any act to effect them in any way; that they were not even furnished with the deed, or advised of its provisions beyond the communication in some cases, of the simple fact of its existence; that it provided for the payment of the judgments in their equal orders, and that they never agreed or intended to waive or surrender any of

their liens.  As to the partial payments on the judgments by the trustee, if conceded, it is utterly denied that any such payments could have the effect of releasing the land conveyed to the trustees from the lien of the judgments.  And as to the whole correspondence, it is maintained that it was nothing more than the correspondence of or on behalf of clients with their attorney, in which, instead of manifesting any agreement or intention to waive their liens or to do any thing to impair them, they are urging the payment of their claims or the adoption of measures to enforce or preserve their liens. And as to the judgments assigned to the bank of Baltimore in November 1840, and by that bank to the appellees, it will be seen by the proof, that the whole correspondence was between Gordon, as attorney of the bank, and Yost, as attorney of record in the cases; that Gordon never was desired to assent, nor did assent to the provisions of the deed; and that he, Gordon, had no authority from the bank to give any such assent, or to do any act to impair its liens, nor any other authority than that incidental to his employment as attorney, which did not carry with it any power to surrender its liens.

Fourth Point.—*As to the credits claimed upon the judgments as presented by appellant's first point.*—This point only presents a claim to the injunction, to the extent of the alleged credits.  It is for the appellant to show that such payments were in fact made, and that they were not credited in the judgments on *sci. fas.*  But even conceding this, it will not be denied that the payments, if made, were *legal* defences to the *sci. fas.* issued on the judgments, of which the appellant could have had the full benefit at law: and that therefore, upon the well settled rule of law recognized by this court in its former decision in this case, the party having failed to avail himself of the defence at law, cannot afterwards have the benefit of it in equity.  And it will be denied, that a party, having legal defences, has the right to waive the advantages of them at law, and suffering the judgment to go against him, to reserve such legal defences for equity, because he has other and merely equitable defences.  And looking to the peculiar

circumstances of this case, it will appear that there are special and peculiar grounds for denying any equitable interference. It is not only not alleged in the complainant's bill, that there were any circumstances showing fraud or surprise upon him attributable to the appellee, or in any other way to excuse his failure to make the defence at law, but on the contrary, the bill does not even set up a claim to these credits, nor is it proved or pretended that the failure to set up these defences is in any way attributable to the appellees. It appears also, that these appellants became the purchasers of the judgments after the confession of the judgments on the *sci. fas.* and gave full value for them without the slightest notice of any such alleged credits, which, if they did exist, were certainly known to Yost the attorney of record of the appellant. And, therefore to permit such defences now to be set up against these appellees would not only violate the general rule of law, but would also perpetrate a fraud upon the appellees, resulting from the laches of Doub or the fraud of his attorney.

Le Grand, C. J., delivered the opinion of this court.

This case was commenced by a bill filed in the high court of chancery, by the appellant Doub, praying an injunction, which was granted, to restrain the appellees from enforcing against certain lands of the appellant various executions issued out of Washington county court, on judgments in said court, and levied on said lands. The case has been several times before the Court of Appeals, and the principles which must govern the more important questions involved in it have been ascertained by the opinions heretofore pronounced.

The complainant invokes the interposition of a court of equity, on the ground that after the rendition of the judgments against Abraham Barnes, M. Mason and John T. Mason, they executed a conveyance of all their real estate in Washington county, and also of a large personal estate, in trust, to pay their debts according to their just priority; that the judgment creditors, of whom the appellees are assignees, had knowledge of this deed and acquiesced in the control of the trustees over

the property conveyed, and by acts indicative of their intention to look for payment of their claims to the proceeds of sales which should be made by the trustees, they gave credit to the trustees, and enabled them to make better sales for the creditors than otherwise would have been effected. That the complainant was persuaded to purchase from the trustees from a belief well founded in the conduct of the creditors, that they would look to the trustees for payment of their claims out of the proceeds of sales, and not to the land.

When the case was before the late Court of Appeals, at June term 1846, on an appeal from the decision of the chancellor dissolving the injunction which had been previously granted, the court said:

"If the judgment creditors assented to the deed of trust, and by their conduct induced the complainant and others to become the purchasers of the lands bound by their judgments, and to believe that they would look to the trustees for the payment of their claims, and not to the liens created by their judgments, we cannot but believe that such conduct would furnish a valid equitable defence. To allow the judgment creditors, after such a course of conduct, to enforce their judgments against the purchasers, would be to permit them to perpetrate a fraud upon the purchasers. The obvious consequence of such a procedure on the part of the judgment creditors would be to lull the purchasers into a false security, and to induce them to believe that a title would follow the payment of the purchase money. Upon the state of facts alleged, it would not be necessary for the purchasers to see to the application of the purchase money, credit being given to the trustees, and they being known to be alone looked to for the payment of the judgments by the proceeds of sales."

To enable the complainant, if within his power, to make out these facts, or a sufficient number of them to entitle him to make out his claim to the relief asked, the case was sent back to the court of chancery.

We understand the Court of Appeals in 4 *Gill*, 19, as affirming the proposition that it is incumbent on the part of

the complainant to establish *affirmatively*, that the judgment creditors, by their conduct, either in fact abandoned their liens, or by it induced the complainant to believe they designed to *look exclusively* to the trustees for payment; and that, unless it so appear, the complainant can have no right to invoke the intervention of the court of chancery to restrain the judgment creditors from enforcing their executions.

This being so, the question then is, has the complainant furnished the required proof? We agree in opinion with the chancellor that he has not.

In the view which we take of the case, it is not important to inquire whether or not the witnesses whose testimony is excepted to, are competent, for in either aspect our decision would be the same. If the testimony be admitted it destroys the equity of the complainant, and if it be rejected his case is without sufficient support.

The complainant made his principal purchase on the 25th of March 1840. Prior to this time the trustees, under the deed of Barnes and the Masons, had been and continued to be for a long time thereafter, the attorneys of the judgment creditors, and as such, a correspondence was carried on between them and the creditors. The deed itself did not, by its terms, propose to interfere with the right or priorities of the creditors, and there is nothing in the correspondence from which the conclusion can be legitimately drawn, that they agreed to surrender any of them. The whole correspondence on their part exhibits but one anxiety, and that is, that they should be paid. In fact there is not a particle of proof in the cause that the complainant, Doub, knew of the correspondence before he completed his purchase by the payment of the purchase money, and it is manifest from the letter of Mr. Yost, dated the 7th day of May 1844, and addressed to Mr. Gordon, that he never supposed the lien of the bank of Baltimore had been waived, for he there expressly tells Mr. Gordon, the attorney of the bank, that if he would have a *scire facias* issued in the case, and would so direct, it should be done immediately.

Doub *vs.* Mason and wife.

We have not thought it necessary to inquire into the doctrine of latent equities, and the circumstances under which it is permissible to avail of them against a legal right. We have considered ourselves bound by the opinion heretofore pronounced by the Court of Appeals, and have examined the record to discover if the complainant had brought his case within the principles therein laid down for the ultimate decision of the case.

In regard to the partial equities growing out of alleged payments on some of the judgments, we are of opinion it is now too late for the complainant to avail himself of them. He had ample opportunity to have done so when the judgments were revived, and not having taken advantage of it then deprives him of the privilege now. He had full notice through his counsel, and on it he confessed judgment to the full amount. In this state of case, it would be a fraud to allow him now to claim a set off against a *bona fide* assignee, who was induced by his act to believe there was no objection to the *amount* of the judgments so confessed.

The suggestion of the counsel for the appellant, that this court should pass a decree compelling John Hanson Thomas to pay the appellees, is one which this court cannot adopt. To do so would be to add to the delay—which has been sufficiently protracted—in rendering justice to the appellees. Moreover, Thomas is not now before this court. Besides this, in the case reported in 4 *Gill*, 1, the court have recognized in the most distinct manner the right of the judgment creditors to proceed, at once, against the land, for they dissolve, absolutely, the injunction restraining Lynch and Craft from enforcing their executions.

Being of opinion that the complainant has failed to establish such an equity as is required and pointed out by the Court of Appeals, in 4 *Gill*, we affirm the ruling of the chancellor, and will sign a decree to that effect.

*Decree affirmed.*